**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

SERGIO ESTRADA,
on behalf of himself and all others
similarly situated,

      Plaintiff,

v.

                                                       **CLASS ACTION**
                                                       **JURY TRIAL DEMANDED**

QC FRANCHISE GROUP, LLC, a South
Carolina limited liability company,
REGENCARE 1142, LLC d/b/a QC
KINETIX DORAL, a Florida limited
liability company, and MED-DEN
FUNDING LLC, a Nebraska limited
liability company,

      Defendants.

_____ /

**<u>CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**INTRODUCTION**...................................................................................................... 1

**PARTIES, JURISDICTION, AND VENUE** ........................................................ 3

**FACTUAL ALLEGATIONS**.................................................................................. 5

    I.   The QC Defendants' Deceptive Marketing Scheme: Peddling Unproven
        Injections as Proven Medical Solutions. ........................................................ 5

    II.  Florida's Express Prohibition on Deceptive Stem Cell Marketing. ..................11

    III. QC Corporate's Control Over the Instrumentalities of the Fraudulent and
        Deceptive Practices. ..................................................................................... 13

    IV. The FTC's and State Attorney Generals' Explicit Condemnation of the
        "Regenerative" Medicine Business Model. ................................................... 17

    V.  Med-Den Funding and the Predatory "Closing" Mechanism. ........................ 19

    VI. How Defendants Targeted and Exploited Plaintiff Estrada Through Deceptive
        Marketing and Sales Tactics. ....................................................................... 22

**CLASS ALLEGATIONS**...................................................................................... 28

    I.   Class Definitions .......................................................................................... 28

    II.  Numerosity ................................................................................................... 30

    III. Commonality................................................................................................ 30

    IV. Typicality .................................................................................................... 31

    V.  Adequacy of Representation ......................................................................... 31

    VI. Superiority/Predominance............................................................................ 32

    VII. Requirements of Federal Rule of Civil Procedure 23(b)(2).......................... 33

**CLAIMS FOR RELIEF** ...................................................................................... 33

    COUNT I ............................................................................................................. 33

    COUNT II ............................................................................................................ 38

    COUNT III........................................................................................................... 42

    COUNT IV........................................................................................................... 45

    COUNT V ............................................................................................................ 47

**PRAYER FOR RELIEF**...................................................................................... 51

**DEMAND FOR JURY TRIAL** ........................................................................... 53

ii

Plaintiff Sergio Estrada files this class action complaint on behalf of himself and all others similarly situated against Defendants QC Franchise Group, LLC, Regencare 1142, LLC d/b/a QC Kinetix Doral, and Med-Den Funding, LLC d/b/a Proceed Finance.

## **INTRODUCTION**

1. This action arises from a calculated and deceptive business model—one that systematically prioritizes profits over patient care—orchestrated by three entities operating in concert: the franchisor, QC Franchise Group, LLC ("QC Corporate"); its local franchisee, Regencare 1142, LLC ("QC Kinetix Doral") (QC Corporate and QC Kinetix Doral, collectively, "QC Defendants"); and their financier, Med-Den Funding, LLC ("Med-Den") (QC Defendants and Med-Den, collectively, "Defendants").

2. QC Corporate markets a "turnkey" clinic system to non-medical investors, promising high returns driven by volume sales. To achieve those returns, Defendants have standardized a predatory patient-intake process across Florida: they lure elderly and desperate consumers into clinics with deceptive advertisements promising both miracle cures and lucrative financing offers and then subject them to a high-velocity sales pitch designed to extract maximum payment before the patient can scrutinize the product or the price.

3. The primary engine of this scheme is a uniform omission from all advertising by QC Corporate and its Florida franchisees—including QC Kinetix Doral—of any disclosure regarding the legality or effectiveness of the treatment. The QC Defendants market "regenerative" and "stem cell" injections as proven, accessible alternatives to surgery and cures for chronic pain. In reality, the FDA has not approved these products for pain management. Recognizing this danger, the Florida Legislature enacted section 458.3245, Florida Statutes, effective July 1, 2025, which mandates that any advertisement for these therapies must disclose their lack of FDA approval. The

1

QC Defendants have ignored and continue to ignore this mandate. To protect their conversion rates, they disseminate standardized advertisements throughout Florida that purposefully omit both the required statutory warning and any reference to the experimental nature of the injections. This uniform omission renders their services materially misleading, legally misbranded, and worthless at the point of sale.

4. Defendants' deception is not limited to the medicine. To mitigate the sticker shock of their unapproved treatments, the QC Defendants target consumers with written promises of "0% Interest" and "Payment Plans starting as low as $100 per month" in their advertisements. This is a bait-and-switch. Once patients are inside the clinic and committed to the procedure, the actual financing provided by Med-Den flips the script. The loans often carry interest rates exceeding 9.99% and impose additional fees. The QC Defendants, in concert with Med-Den, conceal these discrepancies by rushing patients through a click-wrap application while failing to disclose that the generic questions constitute a loan application, thereby bypassing the disclosures that would reveal the scheme.

5. The QC Defendants' scheme mirrors conduct recently condemned by federal regulators. On January 8, 2025, for instance, the Federal Trade Commission ("FTC") announced a permanent ban and a $5.1 million judgment against one stem-cell treatment provider for orchestrating a nearly identical fraud: training clinicians to deceptively market unproven stem cell therapies to elderly and disabled consumers using a vault of misleading advertisements. Despite this clear federal warning—that utilizing a turnkey model to sell unproven regenerative cures to vulnerable consumers is illegal—the QC Defendants, in concert with Med-Den, have persisted. They continue to use the franchise model to scale deception, insulating themselves from liability while their local clinics exploit the very population the FTC seeks to protect.

2

6.      Plaintiff Sergio Estrada, an 87-year-old vulnerable adult, is the face of this dual exploitation. He was lured in by advertisements that omitted mention that the treatment lacked FDA approval and promised both a non-surgical cure and 0% financing. He received neither. Instead, staff at QC Kinetix Doral took control of his phone—going so far as to create a Gmail account for him to sign their documents when they realized he did not have an email of his own— and saddled him with high-interest debt for an unapproved, illegally marketed treatment. In fact, the QC Defendants completed the loan application and asked him to sign the loan documents without telling him he was taking out a loan, ensuring he wouldn't have a chance to review any truth-in-lending disclosures or the contract he had purportedly signed. He brings this action to hold Defendants accountable for this calculated scheme.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Estrada is the representative of the members of the putative class.

8.      Plaintiff Estrada is an 87-year-old resident of Miami-Dade County, Florida. He is a "vulnerable adult" as defined by Florida Statute § 415.102(28) due to the infirmities of aging. Plaintiff Estrada purchased the medical services and entered into the financing agreements at issue in this case.

9.      Defendant QC Franchise Group, LLC is a South Carolina limited liability company with its principal place of business in Charlotte, North Carolina. It is the franchisor of the QC Kinetix system and conducts business throughout Florida.

10.     Defendant Regencare 1142, LLC d/b/a QC Kinetix Doral is a Florida limited liability company with its principal place of business in Doral, Florida. It owns and operates the clinic where Plaintiff Estrada was treated.

11.     Defendant Med-Den Funding, LLC d/b/a Proceed Finance is a Nebraska limited liability company with its principal place of business in Lincoln, Nebraska. It is a consumer lender that finances treatments for patients of the QC Defendants in Florida.

12.     This Court has subject-matter jurisdiction over this case under the Class Action Fairness Act of 2005. *See* 28 U.S.C. § 1332(d). The proposed class exceeds 100 members, the aggregate amount in controversy exceeds $5,000,000, and minimal diversity exists because Plaintiff Estrada is a citizen of Florida while two Defendants are citizens of different states (South Carolina and Nebraska). This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to the extent any of Plaintiff Estrada's claims fall outside this Court's original subject-matter jurisdiction.

13.     This Court has personal jurisdiction over QC Corporate under Fla. Stat. § 48.193(1)(a)(2) because it committed a tortious act within this state. QC Corporate controlled, approved, and disseminated the deceptive advertisements that Plaintiff Estrada viewed in Florida. Under Florida law, a defendant commits a tortious act within this state when it directs deceptive telephonic, electronic, or written communications into Florida that cause injury to a resident. Additionally, QC Corporate is subject to jurisdiction under § 48.193(1)(a)(1) because it operates, conducts, engages in, or carries on a business venture in this state by selling franchises, collecting royalties, and managing a network of clinics throughout Florida.

14.     This Court has personal jurisdiction over Med-Den under Fla. Stat. § 48.193(1)(a)(2) because it committed a tortious act within Florida by facilitating a fraudulent and deceptive financing scheme that targeted Plaintiff Estrada in Florida and because it is operating, conducting, engaging in, or carrying on a business or business venture in this state. Med-Den systematically provides financing to Florida consumers, directs funds into the state, and collects

4

interest payments from Florida residents. This continuous cycle of lending constitutes a business venture under Florida law. Additionally, jurisdiction is proper under § 48.193(1)(a)(2) because Med-Den committed a tortious act within Florida by facilitating a deceptive financing scheme that caused financial injury to Plaintiff Estrada in Florida.

15.     This Court has personal jurisdiction over QC Kinetix Doral because it is a Florida limited liability company with its principal place of business in Doral, Florida. As a citizen of this state, it is subject to the general jurisdiction of this Court.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims—the advertisement, the medical consultation, and the execution of the loan documents—occurred in Miami, Florida, which is within this District.

17.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

### I.     The QC Defendants' Deceptive Marketing Scheme: Peddling Unproven Injections as Proven Medical Solutions.

18.     The QC Defendants present themselves to the public as a cutting-edge medical provider and sanctuary for those suffering from chronic pain.

19.     Their marketing materials are saturated with the iconography of legitimate medicine: professionals in white coats, anatomical diagrams of joints, and technical-sounding terminology. The QC Defendants, however, are not primarily medical providers. They are a sales organization. Their services are not cures for chronic conditions, but they *promise* to be.

20.     The core of the QC Defendants' "regenerative" treatment is the injection of Platelet-Rich Plasma ("PRP") and Bone Marrow Concentrate.

5

21.     In their marketing and on their authorization forms, the QC Defendants explicitly label their treatments as stem cell procedures. This labeling is the engine of their fraudulent and deceptive practices. By invoking the phrase "stem cell," the QC Defendants elicit the perception that they are using cutting-edge science to regrow lost cartilage and repair torn tendons. They present a biological possibility as a medical certainty, promising results that neither the scientific community nor the FDA has validated.

22.     This deception is memorialized in the QC Defendants' paperwork. The standard patient authorization form—used, upon information and belief, uniformly across all Florida locations—categorizes the procedure as "BONE MARROW (STEM CELL)." A true and correct copy of the "AUTHORIZATION FOR NON-ABLATIVE CLASS IV LASER, PLASMA/PRP/A2M, AND BONE MARROW (STEM CELL) PROCEDURES" that QC Kinetix Doral presented to Plaintiff Estrada is attached hereto as **Exhibit A**.

23.     By using this specific terminology on a medical consent form, the QC Defendants confer a false legitimacy on the procedure, leading reasonable consumers to believe they are purchasing a scientifically validated and FDA-approved stem cell therapy.

24.     The QC Defendants' marketing strategy ruthlessly exploits a specific fear: the fear of invasive surgery. Their advertisements frequently juxtapose the agony and downtime of surgery with the ease and natural recovery allegedly available from their injections. In fact, the QC Defendants' primary trademark—emblazoned on every document—is "NON-SURGICAL REGENERATION," suggesting that their injections are a viable substitute for surgery. In reality, however, for patients with bone-on-bone arthritis, they are often merely an expensive delay.

6

25.     This false dichotomy is central to the QC Defendants' print advertising. A representative advertisement circulated by the QC Defendants appeared in the Save coupon book distributed in both the Miami Herald and Miami El Nuevo Herald on July 6, 2025, and is shown below and attached hereto as **Exhibit B**.



7

26.     This advertisement depicts damaged joints and warns consumers against "drugs [and] surgery," instead offering "NON-SURGICAL REGENERATION" as the only logical alternative. *See* Ex. B.

27.     A similar advertisement containing an offer for "Payment Plans starting as low as $100 per month" was circulated by the QC Defendants in the Save coupon book distributed on or around February 10, 2026:



**Image 1**: Print advertisement in the Save coupon book distributed on or about February 10, 2026.

28.     Most critically, the QC Defendants' advertising omits the single most important fact about their products: the lack of FDA approval. *See id.*

29.     The FDA has not approved PRP, stem cells, or bone marrow concentrate for the treatment of musculoskeletal pain, osteoarthritis, or joint degeneration. The QC Defendants do not disclose this lack of approval anywhere in their glossy brochures and advertisements.

30.     This message and the material omission is not limited to print. The QC Defendants blanket the Florida airwaves with a coordinated multimedia campaign. As shown in the various screenshots below, the QC Defendants' video advertisements open with footage of figures in agony. These images are juxtaposed with bright, high-definition footage of "cured" patients enjoying activities like fishing, walking on the beach, and lifting a child in the air.

 

**Composite Image 2**: Screenshots from QC Kinetix South Florida YouTube advertisement, found at the following link as of the date of this filing: https://www.youtube.com/watch?v=r4lzLyFyPfM.

 

**Composite Image 3**: Screenshots from QC Kinetix South Florida YouTube advertisement, found at the following link as of the date of this filing: https://www.youtube.com/watch?v=c6FRf0nuFRY.



**Composite Image 4**: Screenshots from QC Kinetix South Florida YouTube advertisement, found at the following link as of the date of this filing: https://www.youtube.com/watch?v=h_M8wWK_LLw.

31. The advertisements' primary taglines include: "Non-Surgical Regeneration," "Relieve your pain," "Avoid Surgery," "No Surgeries," and "No Downtime." They claim that "non-surgical regeneration" is available for pain in the knee, lower back, hip, shoulder, elbow, foot, hand, wrist, ankle, tendons, ligaments, muscle, "and more."



**Image 5**: Screenshot from QC Kinetix South Florida YouTube advertisement, found at the following link as of the date of this filing: https://www.youtube.com/watch?v=r4lzLyFyPfM.

32. Just like their print counterparts, the QC Defendants' video advertisements are defined by what they omit. At no point during these commercials, whether on television or

10

YouTube,[1] does a narrator, on-screen text, or text in the video description box disclose that the FDA has not approved these treatments. Viewers in Florida are shown a medical solution with no downtime but are never told that the federal agency responsible for drug safety considers the procedure experimental for the reasons for which they are advertised. Upon information and belief, the QC Defendants utilize a similar script for radio spots broadcast throughout Florida. These audio advertisements repeat the regenerative and non-surgical promises to a captive audience of commuters and talk-radio listeners.

33.     This calculated silence extends to the radio as well. Like the video and print ads, the QC Defendants' radio spots fail to disclose that the promoted stem cell and biologic treatments have never been approved by the FDA for the reasons for which they are advertised.

34.     Across every medium—print, video, and audio—the message is uniform: QC Kinetix can deliver a medical cure. QC Kinetix, however, fails to disclose the medical reality.

**II.     Florida's Express Prohibition on Deceptive Stem Cell Marketing.**

35.     The failure to disclose FDA-approval described above is a matter of public safety addressed by specific legislation in Florida.

36.     In 2025, the Florida Legislature enacted Chapter 2025-185, codified as section 458.3245, Florida Statutes.

37.     As noted in the Senate Bill Analysis accompanying the legislation, the State recognized that "[t]he FDA has issued warnings about the widespread marketing of unapproved regenerative medicine products, noting that approval is granted only after rigorous evaluation in

---

[1] The QC Defendants maintain a repository of just some of these deceptive advertisements on their public YouTube channels: https://www.youtube.com/@QCKSouthFlorida and https://www.youtube.com/@QCKinetixNational. A representative example of these video advertisements can be seen at the following link as of the date of this filing: https://www.youtube.com/watch?v=Hq1Bagv8UjY.

clinical trials to ensure safety and efficacy" and "has received reports of serious adverse events associated with unapproved regenerative medicine therapies, including blindness, tumor formation, and infections." *See* Staff of Fla. S. Comm. on Approp. on Health & Human Servs., *Bill Analysis & Fiscal Impact Statement*, C.S. S.B. 1768, at 3 (Apr. 9, 2025), attached hereto as **Exhibit C**.

38.     To prevent these harms, the newly enacted statute expressly regulates "stem cell therapy," which it defines as "a treatment involving the use of afterbirth placental perinatal stem cells, or human cells, tissues, or cellular or tissue-based products, which complies with the regulatory requirements provided in this section." Fla. Stat. § 458.3245(2)(d).

39.     As alleged above, the QC Defendants explicitly market their services as "stem cell" procedures to the public.

40.     To protect consumers from these potentially dangerous treatments, the statute imposes a strict disclosure requirement on all advertising:

> A physician who conducts stem cell therapy pursuant to this section *shall* include the following in *any form* of advertisement:

> THIS NOTICE MUST BE PROVIDED TO YOU UNDER FLORIDA LAW. This physician performs one or more stem cell therapies that have not yet been approved by the United States Food and Drug Administration. You are encouraged to consult with your primary care provider before undergoing any stem cell therapy.

§ 458.3245(5)(a) (all caps in original) (emphasis added).

41.     The statute further dictates that this notice must be "clearly legible and in a type size no smaller than the largest type size used in the advertisement." Fla. Stat. § 458.3245(5)(b).

42.     The QC Defendants have ignored and, thus, violated this statute. As alleged above, their advertisements in Florida—whether in print, video, or radio—uniformly fail to include the statutory warning.

12

### III.   QC Corporate's Control Over the Instrumentalities of the Fraudulent and Deceptive Practices.

43.     The proof that the QC Defendants run a sales system rather than a medical practice is found in QC Corporate's own governing constitution: the 2025 Franchise Disclosure Document ("FDD"), a copy of which is attached hereto as **Exhibit D**. This FDD governed the franchise system at all times relevant to this Complaint.

44.     The FDD is a federally mandated legal instrument under 16 C.F.R. § 436 that defines the limits of the franchisee's independence.

45.     The FDD proves that the deceptive practices alleged herein are not the result of isolated errors by rogue clinic owners, but are specific requirements codified by QC Corporate.

46.     The FDD establishes that QC Corporate retained the right to control—and actually controlled—every material aspect of the patient experience, as it dictates what the clinics sell, how they sell it, and precisely what they are allowed to say to the public. *See* Ex. D at 30–33 (Item 8), 35–46 (Item 11), 102–19 (Franchise Agreement § 8, Ex. A to FDD).

47.     Specifically, franchisees are not free to source their own medical supplies or determine their own treatment protocols.

48.     Under Item 8 of the FDD, franchisees are contractually forced to purchase the proprietary biologics kit and specific medical supplies exclusively from the franchisor or its designated affiliates:

> You must purchase medical kits only from us, or our designated affiliates. Medical kits contain an assemblage of proprietary components that are specified for each type of injection procedure provided every time a client receives a medical procedure at your Franchised Business. For any of these items, we have the right in our sole discretion to designate ourselves, our affiliates, or a third-party as the sole supplier for a particular item.

Ex. D, at 30–31.

13

49. By mandating the source of the product, QC Corporate ensures that every clinic, including QC Kinetix Doral, sells the exact same unapproved FDA treatment, turning the franchisees into distributors and QC Corporate into the direct supplier of the treatment.

50. The uniformity of the deceptive advertising is also contractually mandated.

51. Item 8 of the FDD provides that "[f]ranchisees will be required to place all local TV and radio marketing and all digital marketing through our designated suppliers." *Id.* at 31.

52. The FDD also requires that QC Corporate approve or prepare ***all*** advertising: "All marketing and promotion of your Franchise by you in any medium must be conducted in a professional and dignified manner and must conform to our specified standards and requirements. You must submit samples of all advertising or promotional plans and materials that you desire to use to us for approval if such has not been prepared or previously approved by us." *Id.* at 31–32.

53. Item 11 of the FDD strictly prohibits franchisees like QC Kinetix Doral from creating independent marketing materials. Instead, franchisees must use only the advertising ecosystem created, approved, and circulated by QC Corporate: "Before you open your Business, we will: . . . (11) Approve or disapprove samples of all local advertising and promotional materials not prepared or previously approved by us which are submitted by you. (Franchise Agreement, Sections 6 and 8)[.]" *Id.* at 37.

54. Item 11 also admits that the deceptive advertisements originate directly from corporate headquarters: "The source of the advertising will come from our in-office advertising department or may, in the future, come from a national or local advertising agency. We reserve the right to determine in our sole discretion the composition of all territories and market areas for the implementation and development of such programs." *Id.* at 38.

14

55.     This control is contractually binding through the Franchise Agreement attached as Exhibit A to the FDD. *Id.* at 81–178.

56.     Section 8.9 of the Franchise Agreement strips the franchisees of the right to independent commercial speech:

In order to further protect the System and our goodwill, Franchisee shall . . .

(e) Use only the types of equipment, supplies and services so as to conform to Franchisor's specifications. This includes using Franchisor's approved vendors in addition to Franchisor's requirements regarding franchise equipment, promotional items, advertising and marketing materials as detailed in the Manual all of which may be revised by Franchisor, at Franchisor's sole discretion, from time to time;

. . .

(l) Conduct any advertising, promotion and/or public relations in any medium in a dignified manner and shall conform to our standards and requirements as set forth in the Operations Manual;

*Id.* at 107–08 (§ 8.9(e), (l)).

57.     This control is further codified in the confidential Operations Manual, which franchisees are contractually obligated to follow under Section 8 of the Franchise Agreement.

58.     The Table of Contents for the Operations Manual, a copy of which is attached to the FDD, reveals that QC Corporate micromanages every specific channel of communication used to solicit patients.[2]

59.     The Manual dedicates specific subsections to "Marketing to the Consumer" (§ 8:3.1), "Radio Advertising" (§ 8:3.5), "Television Advertising" (§ 8:3.6), "Print Advertising" (§ 8:3.8), "YouTube" (§ 8:4.5), and "Social Media" (§ 8:4). *Id*. at 225–29. This granularity

---

[2] Plaintiff Estrada does not currently possess the full text of the Operations Manual, as QC Corporate classifies it as a trade secret and restricts its distribution solely to franchisees. Plaintiff Estrada relies here on the Table of Contents, which was disclosed in the FDD, and intends to seek production of the full Operations Manual during discovery to further particularize the specific deceptive scripts and protocols mandated by the franchisor.

15

confirms that the deceptive print, video, and radio advertisements described above were not ad-hoc creations of local staff.

60.     Thus, when a potential patient in Florida sees a radio, video, or print advertisement promising a cure for joint pain and omitting any notion of lack of FDA  approval, that message was authored, approved, and distributed by QC Corporate.

61.     This control extends to the digital realm, ensuring that no local clinic can offer a competing, truthful narrative online. Specifically, the FDD provides:

> Franchisee agrees and acknowledges that maintenance and any changes, edits or updates to the website and/or any Website promotions over the Internet must be performed by Franchisor, its affiliates and/or approved vendors. . . . Franchisee may neither establish nor use any Website without Franchisor's prior written approval and if such approval is granted Franchisee must comply with our requirements regarding discussing, advertising or disseminating any information on a website.

*Id*. at 48.

62.     Finally, QC Corporate forces franchisees to fund this deception through a mandatory "Brand Development Fund." *Id*. at 99.

63.     Franchisees must pay 1% of their Gross Revenue to this Fund, which QC Corporate uses to "support ongoing technology . . . [and] for such advertising as we, in our sole discretion, may deem appropriate." *Id*.

64.     Beyond the corporate fund, QC Corporate forces franchisees to spend massive sums on advertising in their local markets.

65.     The FDD and Franchise Agreement dictate that franchisees must "initially spend $10,000 to $20,000 for grand advertising" before they even open. *Id*. at 40.

66.     Once open, the spending mandate accelerates aggressively. The FDD states that by the sixth month, a franchisee is required to spend "up to $40,000 per month per location." And in

larger markets, the mandate is even more extreme: "In large markets, such as Los Angeles, for example, the monthly advertising could be as high as $75,000." *Id.*

67.     To ensure that this massive budget is spent only on the deceptive corporate scripts, QC Corporate locks the franchisees into a closed loop of vendors: "Currently, franchisees are required to place all local TV and radio marketing and all digital marketing through our designated suppliers." *Id.*

68.     Through the Franchise Agreement, QC Corporate ensures compliance with these mandates through the threat of termination:

> Franchisor may terminate the franchise and all rights granted to Franchisee thereunder without affording Franchisee any opportunity to cure the breach/default and effective immediately upon Franchisor notifying Franchisee in writing thereof, if Franchisee or any of its Owners does any of the following:
>
> (29) Fails or refuses to: (i) cease using and/or remove any items from the Franchised Business deemed to constitute a violation of this Agreement by Franchisor; (ii) sell or offer Services according to Franchisor's standards and specifications; and/or (iii) purchase supplies, software, advertising and marketing materials from Franchisor, its affiliates or approved vendors and suppliers . . . .

*Id.* at 147–48.

69.     Through this contractual architecture, QC Corporate has built a sales and marketing machine where the deception is centrally authored, mandatorily funded, and strictly enforced.

**IV.     The FTC's and State Attorney Generals' Explicit Condemnation of the "Regenerative" Medicine Business Model.**

70.     The QC Defendants operate in the shadow of a direct federal prohibition.

71.     The FTC, as the nation's primary consumer protection authority, has explicitly condemned the exact business model employed by QC Corporate.

17

72. On March 11, 2024, the FTC secured a dispositive victory against a parallel "stem cell" network in *Federal Trade Commission v. Peyroux*, No. 1:21-cv-03329 (N.D. Ga.). A copy of the Order Granting Summary Judgment is attached hereto as **Exhibit E**.

73. The Commission successfully established that marketing stem cell therapy as "comparable or superior to surgery" is false and misleading. *See* Ex. E, at 38–42. This prohibition strikes at the very essence of QC Kinetix's "Non-Surgical Regeneration" trademark.

74. The Commission further established that representations regarding the ability of these injections to "cure, treat, or mitigate" osteoarthritis and joint pain are legally deceptive and unsupported by competent and reliable scientific evidence. *Id.*

75. Crucially, the FTC's enforcement action targeted the architect of the scheme rather than just the local clinics, establishing that a corporate entity is liable when it furnishes the means for others to commit fraud. *Id.* at 44–46. This includes providing deceptive marketing materials, scripts, and logos. *Id.*

76. This federal finding eliminates any notion that QC Corporate is a mere licensor. QC Corporate provides the FDD-mandated advertisements and the "Non-Surgical" branding and, therefore, furnishes the precise instrumentalities of deception that the FTC has proscribed.

77. The FTC's crusade against this industry culminated on December 26, 2024, when it secured a permanent injunction banning the *Peyroux* defendants from advertising, marketing, promoting, or offering for sale stem cell therapy for orthopedic conditions. A copy of the order granting the permanent injunction is attached hereto as **Exhibit F**.

78. At least one state's attorney general has also cracked down on the deceptive marketing tactics employed by similar stem cell entities as the QC Defendants. On November 25, 2025, the Iowa District Court for Polk County entered a sweeping judgment and permanent

injunction against a chain of "regenerative medicine" clinics in *State of Iowa ex rel. Brenna Bird v. Travis Broughton*, Case No. EQCE086086. The order is attached hereto as **Exhibit G**.

79.     Finding multiple violations of the Iowa's Consumer Fraud Act, the court determined that the clinics' "stem cell" and "exosome" advertising had no reasonable basis and was intended to "mislead the targeted customers, primarily the elderly with chronic and/or painful medical conditions for which they received little or no relief from traditional medical treatments." Ex. G at 20.

80.     Echoing the exact predatory financial and upsell tactics utilized by the QC Defendants in this case, the Iowa court explicitly condemned the stem cell clinics' sales model. The court noted that the "significant expense of the treatments, including encouraging consumers to purchase more doses, was a cynical means of portraying the treatments as exclusive and valuable." *Id*. at 20-21.

81.     As a result of this fraud, the court ordered over $810,000 in consumer restitution and levied enhanced civil penalties specifically for the targeting and exploitation of older individuals.

82.     The QC Defendants continue to market the same unproven "cures" for the same orthopedic conditions and use the same non-surgical comparisons that the FTC has deemed unlawful.

V.     **Med-Den Funding and the Predatory "Closing" Mechanism.**

83.     The deceptive advertising and statutory violations described above have an important purpose: to drive patients into a high-pressure sales environment where the Defendants can extract the patients' savings.

19

84. The financial commitment required is staggering. A standard "QC Kinetix Treatment Plan," a copy of which was handed to Plaintiff Estrada during his visit and is attached hereto as **Exhibit H**, lists the baseline cost for a first treatment area at $9,500. The treatment plan quotes $4,700 for each additional area treated at the same time. For example, a patient seeking relief for bilateral knee pain faces an immediate, upfront demand of $14,200.

85. The initial payment is merely the entry fee. The Treatment Plan prescribes a regimen of four subsequent sessions—"Visit 2" through "Visit 5"—spanning a period of three months, for "Alpha 2 Macroglobulin (A2M) Therapy," "Bone Marrow Aspirate Concentrate (BMAC) Therapy," "Platelet Rich Plasma (PRP) Therapy," and "Plasma Therapy." Ex. H.

86. Crucially, the Treatment Plan fails to disclose the specific costs for these four additional visits. Upon information and belief, the cost to complete each step in the plan is similar to the initial payment, potentially quintupling a patient's financial exposure after they have committed to the first visit.

87. To facilitate this multi-stage extraction, the financing is often structured as a hybrid trap. Patients are frequently signed up for a fixed loan to cover the initial treatment, while simultaneously being enrolled for a revolving line of credit. This secondary credit line lies in wait, pre-approved to absorb the costs of the inevitable follow-up treatments, ensuring that the Defendants can extract future revenue without running a new credit check.

88. Many elderly patients living on fixed incomes cannot afford these sums out-of-pocket. To overcome this barrier, the QC Defendants utilize a captive financing partner: Med-Den, which does business as "Proceed Finance."

89. The link between the treatment and the financing is explicit. On the face of Exhibit H, for example, next to the price, the clinic staff handwrote the word "Proceed" and the amount

20

"9,000," suggesting that the medical consultation is seamlessly fused with the financial transaction. The patient is not given a prescription and sent home but rather sold a loan product in the exam room.

90.     This fusion is not accidental. Upon information and belief, QC Corporate trains its franchisees and their staff to handle the loan application for the patient.

91.     Rather than allowing the patient to apply privately, QC Kinetix Doral clinic staff pressure patients to complete financing applications on the spot—often without even disclosing that they are applying for a loan.

92.     The staff member then guides the patient through the electronic application, often clicking through the truth-in-lending disclosures on the patient's behalf or dismissing the high-interest terms as standard paperwork.

93.     This "concierge" service ensures that the patient focuses solely on the monthly payment rather than the staggering total cost of the debt.

94.     Upon information and belief, this aggressive push for financing is driven by a hidden financial incentive. Plaintiffs allege that the QC Defendants and Med-Den operate a pay-to-play or rebate arrangement.

95.     Upon information and belief, the QC Defendants receive a direct or indirect financial benefit—whether structured as a fee, commission, bonus, or rebate—from Med-Den for every loan originated, brokered, or facilitated through its platform.

96.     This arrangement creates an undisclosed conflict of interest: the "Patient Care Coordinators," as referenced in the FDD,[3] advising the patient is not merely assisting with payment

---

[3] "**Sales Training.** Franchisees are required to ensure that their Patient Care Coordinators (PCCs) complete Sales Training, which is delivered virtually over the course of one (1) day. This training focuses on best practices for patient consultations and effective sales strategies designed to support

21

options but is actively incentivized to sell high-interest debt to generate revenue for the franchise network.

97.     Upon approval of the loan application and prior to delivery of the treatment, Med-Den or a third-party partner bank transfers the principal amount directly to the QC Kinetix clinic. The clinic gets paid immediately and assumes no risk while the patient is left with a long-term loan obligation to Med-Den or the third-party bank, and Med-Den collects its fees for brokering the transaction.

**VI.     How Defendants Targeted and Exploited Plaintiff Estrada Through Deceptive Marketing and Sales Tactics.**

98.     Plaintiff Sergio Estrada is a resident of Miami-Dade County, Florida. He is a layperson with no specialized medical training.

99.     Plaintiff Estrada is 87 years old. His ability to perform normal activities of daily living and provide for his own care is impaired due to the infirmities of aging. Among other things, Plaintiff Estrada suffers from cognitive and physical decline consistent with that of an aging individual, including chronic joint pain that limits his mobility and his ability to care for himself.

100.    In or around July and August 2025, Plaintiff Estrada was exposed to the QC Defendants' pervasive marketing campaign. Plaintiff Estrada regularly receives Save coupon books inside the Miami El Nuevo Herald newspaper, which is delivered to his home.

101.    Starting in July 2025, Plaintiff Estrada began seeing advertisements from QC Kinetix in these Save coupon books. The advertisements promoted QC Kinetix's regenerative medical treatments, claiming they could treat chronic pain—including in the knees, shoulders, hip,

---

clinic growth and patient conversion. The program is accessible through our Learning Management System (LMS) and includes optional live support sessions to reinforce key concepts and provide real-time guidance. Sales Training is an essential component of onboarding and ongoing development for PCCs." Ex. D at 46.

back, neck, arms, wrists, feet, and osteoarthritis—without any surgery, steroids, or downtime. The advertisements featured a photograph of a man in a white coat, captioned "Sander Fernandez, MD," identified as the "Medical Director."

102.    These advertisements did not contain the mandatory notice required by Florida Statute § 458.3245(5)(a), nor did they disclose that the treatment is not approved by the FDA.

103.    The advertisements listed nine QC Kinetix locations in Florida: Aventura, Boca Raton, Boynton Beach, Coral Gables, Doral, Pembroke Pines, Tamarac, West Palm Beach, and Palmetto Bay. They stated, "CALL TODAY & SCHEDULE," and listed a single phone number and a link to the QC Kinetix website (QCKinetix.com).

104.    Plaintiff Estrada saw three QC Kinetix advertisements throughout July and August 2025 in his Save coupon book. During the week of August 4, 2025, Plaintiff Estrada reviewed one of those advertisements, dated July 6, 2025, which is attached as **Exhibit B**. This advertisement promoted a "Summer Special" offering "$500 off and up to **12 months 0% interest** on any treatment."

105.    After reviewing this advertisement, Plaintiff Estrada called the listed number and scheduled an appointment at QC Kinetix Doral for August 8, 2025. To book the appointment, the representative asked for Plaintiff Estrada's name, address, phone number, and health insurance information.

106.    On August 8, 2025, Plaintiff Estrada visited QC Kinetix Doral. His wife drove him to the appointment and accompanied him into the clinic.

107.    When Plaintiff Estrada entered the clinic, he was instructed to sit down and was handed an iPad. Plaintiff Estrada explained that he did not know how to use the iPad and that he only speaks Spanish. One of the receptionists offered to assist. Speaking to Plaintiff Estrada in

23

Spanish, the receptionist asked him for general information about himself and input his responses into the iPad. Critically, although the QC Kinetix Doral staff communicated with Plaintiff Estrada exclusively in Spanish throughout his visit, all documents presented to him—including medical authorizations, treatment plans, and financing paperwork—were in English. At no point did anyone translate or explain the contents of these documents to him.

108.    The receptionist then escorted Plaintiff Estrada to an examination room and informed him that the "doctor is coming." Shortly thereafter, Estefania Parra, APRN, FNP-BC, entered the room and introduced herself as a nurse.

109.    Plaintiff Estrada explained to Ms. Parra that he had pain in his knee and wanted to avoid surgery if possible. Ms. Parra told him that they could treat his pain with injections.

110.    Plaintiff Estrada was then moved to an office, where the receptionist presented him with a Treatment Plan written entirely in English. As shown in the Treatment Plan, QC Kinetix Doral staff diagnosed Plaintiff Estrada with "Left Knee" pain and quoted him a price of $9,000 for the treatment. *See* Ex. H.

111.    The receptionist did not explain the various visits that would be necessary as part of the Treatment Plan, did not provide a copy of the Treatment Plan in Spanish, and did not translate or explain the document's contents. Instead, the receptionist simply instructed Plaintiff Estrada to "sign here" at the bottom of the page.

112.    When Plaintiff Estrada indicated he could not pay $9,000 in cash, the QC Kinetix Doral staff immediately pivoted to financing, without ever running his insurance despite having collected his insurance information—all to give the clinic medical legitimacy and Plaintiff Estrada the impression that it would be covered. As evidenced by the handwritten note—"Proceed

24

$9,000"—on the Treatment Plan, the medical decision and the financial transaction were fused into a single event.

113. Using Plaintiff Estrada's iPhone, the QC Kinetix Doral staff processed a loan application for him on the spot.

114. Because Plaintiff Estrada is elderly and not digitally literate, he did not have an email address—a requirement to process the digital loan application. To bypass this obstacle, QC Kinetix Doral staff created a Gmail account for him on the spot: sergioestrada1938@gmail.com.

115. The staff entered this newly created email address into the Proceed Finance application on Plaintiff Estrada's iPhone. As part of their predatory scheme, they never informed Plaintiff Estrada that they were processing a loan application on his behalf.

116. By controlling the email account, QC Kinetix Doral ensured that Plaintiff Estrada would never receive a welcome packet, truth-in-lending disclosures, or payment notifications from the lender. They effectively severed his ability to monitor his own debt.

117. QC Kinetix Doral staff then moved Plaintiff Estrada to a treatment room, where they drew his blood, left the room to process it, and returned with his "treatment."

118. At this point, Ms. Parra asked Plaintiff Estrada if he had ever received any injections in his knee before. He responded that he had not.

119. Ms. Parra inserted a port into Plaintiff Estrada's left knee and proceeded to give him two injections through the port. She explained that the treatment was a "new" type of treatment comprised of "mother stem cells" that would "cure his pain *immediately*."

120. As Plaintiff Estrada was receiving the second injection, QC Kinetix Doral staff presented the iPhone to him. Rather than allowing him to scroll through the loan terms, they navigated directly to the signature blocks and instructed him to sign. They did not provide him

25

with an opportunity to review the full terms of the agreement—let alone disclose that he was signing a loan agreement. The loan application and all associated documents were in English, and no one translated or explained them to Plaintiff Estrada.

121. Although Plaintiff Estrada had been lured, in part, by advertisements promising 0% interest for the first twelve months, the loan processed by QC Kinetix Doral staff carried an annual percentage rate of 9.99% from the outset.

122. On the loan application, attached hereto as **Exhibit I**, Plaintiff Estrada's gross annual income is listed as $15,000.

123. Despite knowing that Plaintiff Estrada lived on a poverty-level fixed income of just $1,250 per month, the QC Defendants and Med-Den Funding approved a $9,000 loan—representing 60% of his annual income—with a monthly payment of $166.69. The loan agreement is attached hereto as **Exhibit J**.

124. Upon information and belief, the QC Defendants did not stop at the $9,000 loan. Using the credentials they controlled, they opened a revolving line of credit in Plaintiff Estrada's name to cover the remainder of the visits contemplated in the Treatment Plan.

125. Plaintiff Estrada was never evaluated by a medical doctor for a traditional diagnosis. Instead, he was seen only by a Patient Care Coordinator.

126. The QC Kinetix Doral staff assured Plaintiff Estrada that the treatment would repair and regenerate damaged tissue in his knee, thereby allowing him to avoid surgery.

127. At no point during this sales consultation did the QC Kinetix Doral staff inform Plaintiff Estrada that the treatment was experimental or disclose that it has not been approved by the FDA.

128.     On his way out of the clinic, Plaintiff Estrada requested a physical copy of his treatment paperwork. QC Kinetix Doral staff provided him with a dense medical authorization form-written entirely in English, which is attached hereto as **Exhibit A**. Staff instructed Plaintiff Estrada to sign the form without translating or explaining its contents. He signed.

129.     The injections that Plaintiff Estrada received did not work. His pain persists.

130.     Two or three days after the failed treatment, Plaintiff Estrada's granddaughter discovered the Med-Den Financing application still open on his iPhone. She noticed the email address associated with the application and asked Plaintiff Estrada for the password. He did not know it, but his granddaughter found it written on a sticky note that QC Kinetix Doral staff had given him. She logged into the Gmail account and discovered that her grandfather had been approved for a loan.

131.     Plaintiff Estrada's family members immediately called Med-Den in an attempt to mitigate the damage. They requested copies of the loan documentation, which Med-Den provided via email as PDFs. They also requested a refund of the $9,000 principal from both Med-Den and QC Kinetix Doral.

132.     QC Kinetix Doral refused. Plaintiff Estrada's family members even drove to the clinic and demanded a refund in person, but clinic staff refused to speak with them.

133.     Plaintiff Estrada also sought relief from Med-Den, the financier.

134.     Med-Den refused to cancel the loan in full, as $4,950 of the principal had already been disbursed. However, as a result of Plaintiff Estrada's demands, Med-Den cancelled $4,050 of the remaining loan balance.

135. Med-Den continues to demand monthly payments from Plaintiff Estrada's limited fixed income, effectively acting as the enforcer for the QC Defendants' deceptive and misleading conduct.

136. Plaintiff Estrada is one of many victims of the Defendants' deceptive and unfair trade practices. His experience—being lured by deceptive advertising, shielded from the mandatory disclosure that the treatments are not FDA-approved, diagnosed without any meaningful physical examination, deceived into signing a predatory loan without being told it was a loan, and receiving treatment that failed—is typical of those resulting from the turnkey system sold by QC Corporate, put into action by QC Kinetix Doral, and financed by Med-Den Funding.

137. Across Florida, thousands of other vulnerable individuals find themselves in the same position: saddled with high-interest debt for a medical procedure that was illegally marketed.

138. This class action is meant to hold the Defendants accountable for the thousands they have swindled, to strip them of their ill-gotten gains, and to ensure that their deceptive promises are subjected to the truth.

## CLASS ALLEGATIONS

### I. Class Definitions

139. Plaintiff Estrada brings this action on his own behalf, and on behalf of all persons similarly situated, under Rules 23(a) and (b)(2) or (b)(3) of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. Plaintiff Estrada seeks to certify the following proposed class and subclasses:

*The Florida Class:*

All persons who, within the applicable statute of limitations, purchased regenerative or stem cell medical services from a QC Kinetix clinic located in the

28

State of Florida, whether operated directly by the QC Franchise Group, LLC or by its franchisees, subsidiaries, or affiliates.

***The Florida Financing Subclass:***

All members of the Florida Class who entered into a loan, line of credit, or other financing agreement brokered, facilitated, originated through, or administered by Med-Den Funding, LLC (d/b/a Proceed Finance), its subsidiaries, affiliates, or its partner banks, to pay for regenerative or stem cell medical services.

***The Doral Subclass:***

All members of the Florida Class who purchased regenerative or stem cell medical services from the QC Kinetix clinic located in Doral, Florida operated by Defendant Regencare 1142, LLC d/b/a QC Kinetix Doral.

***The Doral Financing Subclass:***

All members of the Doral Subclass Class who entered into a loan, line of credit, or other financing agreement brokered, facilitated, originated through, or administered by Med-Den Funding, LLC (d/b/a Proceed Finance), its subsidiaries, affiliates, or its partner banks, to pay for said medical services.

140.    Excluded from each class are (1) the Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; (2) class counsel and their employees; and (3) the judicial officers and their immediate family members and associated court staff assigned to this case. Claims for any personal physical injuries related to the treatments are also excluded.

141.    Plaintiff Estrada reserves the right to modify, expand, or amend the definitions of the proposed classes following the discovery period and before the Court determines whether class certification is appropriate.

142.    Plaintiff Estrada also reserves the right to seek the certification of classes with respect to particular issues under Federal Rule of Civil Procedure 23(c)(4).

143.    Certification of the Plaintiff Estrada's claims for class-wide treatment is appropriate because the Plaintiff Estrada can prove the elements of his claims on a class-wide basis using the

29

same evidence as would be used to prove these elements in individual actions alleging the same claims.

## II.    Numerosity

144.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1). There are thousands of consumers in Florida who purchased unapproved regenerative or stem cell treatments from a QC Kinetix clinic in the State of Florida, whether operated directly by the QC Defendants or by their franchisees, subsidiaries, or affiliates.

145.    The identity of class members is ascertainable. They can be easily identified through the patient ledgers and financial records of the QC Defendants, as well as the loan databases maintained by Med-Den and its partner banks. Plaintiff Estrada anticipates providing appropriate notice to each certified class and subclass in compliance with Federal Rules of Civil Procedure 23(c)(2)(A) or (B), to be approved by the Court after class certification, or as ordered by the Court under Federal Rule of Civil Procedure 23(d).

## III.    Commonality

146.    This action satisfies the requirements of Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3) because there are questions of law and fact that are common to each of the classes. These common questions predominate over any questions affecting only individual class members. The predominating common questions include (among other things):

      a.   Whether the QC Defendants' advertisements violated Fla. Stat. § 458.3245 by failing to include the mandatory disclosure that the stem cell therapies are not approved by the FDA;

      b.   Whether the marketing of non-surgical regeneration or stem cell treatment as a cure or alternative to surgery constitutes a deceptive trade practice under FDUTPA;

      c.   Whether QC Corporate furnished the means and instrumentalities of the fraud by controlling and mandating the deceptive marketing materials used by local franchisees;

30

d. Whether a reasonable consumer would likely be misled by the Defendants' uniform misrepresentations and omissions;

e. Whether Med-Den operated a predatory financing scheme that integrated seamlessly with the QC Defendants' high-pressure sales tactics;

f. Whether the financing agreements are void or unenforceable due to the illegality of the underlying medical sales transaction;

g. Whether Plaintiff and the class members suffered damages as a result of purchasing treatments that were marketed in violation of Florida law; and

h. Whether damages, restitution, equitable, injunctive, declaratory, or other forms of relief are warranted.

## IV. Typicality

147. This action satisfies the requirements of Federal Rule of Civil Procedure 23(a)(3) because Plaintiff Estrada's claims are typical of the claims of each of the class members, as all class members were and are similarly affected and their claims arise from the Defendants' same wrongful conduct.

148. Each class member was exposed to the same uniform marketing campaign. Each class member was subjected to the same standardized sales process and deprived of the same mandatory statutory disclosure.

149. Furthermore, the members of the Florida Financing Subclass and Doral Financing Subclass were all funneled through the same Med-Den digital loan portal. The relief Plaintiff Estrada seeks in this action is typical of the relief sought for the absent class members.

## V. Adequacy of Representation

150. Plaintiff Estrada is an adequate representative under Federal Rule of Civil Procedure 23(a)(4). Plaintiff Estrada will fairly and adequately protect the interests of the class members. Plaintiff Estrada is committed to the vigorous prosecution of this action and there is no

hostility or conflict between or among Plaintiff Estrada and the unnamed class members. Plaintiff anticipates no difficulty managing this case as a class action.

151. To prosecute this case, Plaintiff Estrada has chosen the undersigned law firm, which has substantial experience in prosecuting large and complex class actions, as well as the financial resources to meet the costs associated with the vigorous prosecution of this type of case. Plaintiff Estrada and his counsel will fairly and adequately protect the interests of all class members.

### VI. Superiority/Predominance

152. This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the class members. The joinder of individual class members is impracticable because of the vast number of class members who purchased these deceptively marketed treatments.

153. Because the monetary damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation by even a small fraction of the class members would be enormous.

154. In comparison to piecemeal litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each class member. The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation. Class adjudication is simply superior to other alternatives under Federal Rule of Civil Procedure 23(b)(3)(D).

155.    Plaintiff is unaware of any obstacles likely to be encountered in managing this case that would preclude its maintenance as a class action. Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on Plaintiff Estrada's motion or on its own determination, certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Federal Rule of Civil Procedure 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and employ Federal Rule of Civil Procedure 23(c)(5) to divide any class into subclasses.

**VII.    Requirements of Federal Rule of Civil Procedure 23(b)(2)**

156.    The Defendants have acted or failed to act in a manner generally applicable to the class members in the Florida Class, the Florida Financing Subclass, the Doral Subclass, and the Doral Financing Subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to either or all of the classes.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Unfair and Deceptive Marketing and Sales Practices**
**(Against QC Corporate on behalf of the Florida Class)**
**(Against QC Kinetix Doral on behalf of the Doral Subclass)**

157.    Plaintiff Estrada incorporates by reference paragraphs 1 through 156 as though set forth herein.

158.    Plaintiff Estrada, the members of the Florida Class, and the members of the Doral Subclass are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(7), (8).

159.    The QC Defendants engage in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

160.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

161.    The QC Defendants engaged in a uniform scheme of unfair and deceptive trade practices that violated FDUTPA by employing standardized marketing and in-clinic sales processes designed to extract maximum payment before patients could scrutinize the product or the price.

162.    Specifically, QC Corporate engaged in these unfair and deceptive trade practices against the Florida Class by furnishing the means and instrumentalities of this scheme. Pursuant to its Franchise Disclosure Document and Operations Manual, QC Corporate authored, mandated, and enforced standardized training, corporate sales scripts, advertisements, and uniform clinic policies across all Florida locations.

163.    QC Kinetix Doral executed these franchisor-mandated policies locally against the Doral Subclass.

164.    Pursuant to this uniform corporate system, the QC Defendants executed these unfair and deceptive practices by:

    a. Representing that the non-surgical regeneration and stem cell treatments have characteristics that they do not have, including that they are proven alternatives to surgery and cures to chronic pain;

    b. Representing that the non-surgical regeneration and stem cell treatments are medically approved for the purpose for which they are advertised, which they are not;

    c. Failing to disclose that the non-surgical regeneration and stem cell treatments are not approved by the FDA, even though they knew that such information was material to consumers;

34

d. For advertisements disseminated on or after July 1, 2025, failing to include the mandatory statutory notice required by Florida Statute § 458.3245(5)(a)-(b), which operates as a statute that proscribes unconscionable, deceptive, or unfair acts or practices, thereby committing a *per se* deceptive trade practice;

e. Systematically utilizing clinic-controlled digital tablets as a point-of-sale system and retaining custody of consumers' cellular devices to strictly control the flow of information, preventing patients from privately reviewing the terms of their medical and financial agreements;

f. Rushing patients through electronic signatures as a matter of standard operating procedure, without allowing them time to read the dense, standardized documents;

g. Enforcing a uniform policy of failing to provide patients with translated forms or physical copies of medical authorizations prior to accepting payment;

h. Utilizing non-physician "Patient Care Coordinators" rather than medical doctors to conduct the initial patient evaluation and execute the high-pressure financial close;

i. Utilizing a standardized "Treatment Plan" document that intentionally obscures the total, long-term cost of the multi-visit regimen to secure the patient's initial financial commitment;

j. Systematically fusing the medical consent process with the loan application process, training staff to act as "concierge" financial brokers who input patient data and bypass mandatory financial disclosures on the patient's behalf; and

k. Uniformly omitting the material fact that the non-surgical regeneration and stem cell treatments are not approved by the FDA at any point during the standardized sales consultation.

165. The QC Defendants' standardized, high-pressure sales tactics, coupled with their failure to disclose the material fact that such treatments have not been approved by the FDA, had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to deceive reasonable consumers, including Plaintiff Estrada, the Florida Class members, and the Doral Subclass members, about the characteristics, safety, efficacy, and true value of such treatments.

166. When deciding whether to purchase treatment from a QC Kinetix clinic, Plaintiff Estrada, the Florida Class members, and the Doral Subclass members were subjected to this

35

uniform process and had no reasonable way to know that the non-surgical regeneration and stem cell treatments were not approved by the FDA and did not have "regenerative" capabilities.

167.     Plaintiff Estrada, the Florida Class members, and the Doral Subclass members had no reason to believe that the treatments were not approved by the FDA or otherwise medically approved for the purpose in which they are advertised, especially in light of The QC Defendants' prominent display of a photograph of a man in a white coat, identified as "Sander Fernandez, MD," QC Kinetix Doral's "Medical Director"—imagery deliberately designed to confer the legitimacy of FDA-approved medicine on treatments that lack any such approval.

168.     These material misrepresentations and omissions were likely to deceive a consumer acting reasonably in the same circumstances, and proximately caused the ascertainable losses suffered by Plaintiff Estrada, the Florida Class, and the Doral Subclass.

169.     Plaintiff Estrada, the Florida Class members, and the Doral Subclass members were injured as a result of the QC Defendants' conduct because Plaintiff Estrada, the Florida Class members, and the Doral Subclass members traveled to obtain the treatments and paid to obtain FDA-approved treatments and instead received and overpaid for ineffective and unapproved services.

170.     Had they been aware of these facts, and had they been permitted to review their medical and financial agreements free from the QC Defendants' uniform high-pressure tactics, Plaintiff Estrada, the Florida Class members, and the Doral Subclass members either would have paid less for their treatments or would not have purchased the treatments at all.

171.     Plaintiff Estrada, the Florida Class members, and the Doral Subclass members are entitled to recover their actual damages, including out-of-pocket losses from obtaining FDA-approved medical treatments and economic damages at the point of sale equal to the difference

36

between the value of the treatments as promised and the value of the treatments as delivered. *See* Fla. Stat. § 501.211(2). Plaintiff Estrada, the Florida Class members, and the Doral Subclass members are also entitled to recover their attorneys' fees. *See* Fla. Stat. § 501.2105(1).

172.    Plaintiff Estrada, the Florida Class members, and the Doral Subclass members are thus entitled to declaratory and injunctive relief under § 501.211(1), including a declaration that the QC Defendants' deceptive and unfair conduct violates FDUTPA and harms the consuming public, and an injunction prohibiting further such violations.

173.    Plaintiff Estrada, the Florida Class members, and the Doral Subclass members were aggrieved by the QC Defendants' misrepresentations and omissions because he paid a price premium for the treatments.

174.    Plaintiff Estrada, the Florida Class members, and the Doral Subclass members have also suffered and will continue to suffer irreparable harm if the QC Defendants continues to engage in deceptive, unfair, and unreasonable practices.

175.    Plaintiff Estrada, on behalf of the Florida Class members and the Doral Subclass members, requests that the Court award actual damages, declare that the QC Defendants' sales tactics violate FDUTPA, issue an order requiring the QC Defendants to cease their deceptive and unfair sales practices (including requiring the QC Defendants to notify the Florida Class members and the Doral Subclass members of the non-surgical regeneration and stem cell treatments' proven efficacy and lack of FDA-approval), and award Plaintiff Estrada, the Florida Class members, and the Doral Subclass members' attorneys' fees and costs. Plaintiff Estrada, the Florida Class members, and the Doral Subclass members also requests any other just and proper relief available under FDUTPA.

37

## COUNT II
### Violation of FDUTPA
### Unfair and Deceptive Financing Practices
**(Against QC Corporate and Med-Den on behalf of the Florida Financing Subclass)**
**(Against QC Kinetix Doral on behalf of the Doral Financing Subclass)**

176.     Plaintiff Estrada incorporates by reference paragraphs 1 through 156 as though set forth herein.

177.     Plaintiff Estrada, the members of the Florida Financing Subclass, and the members of the Doral Financing Subclass are "consumer[s]" engaged in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(7), (8).

178.     The QC Defendants and Med-Den engage in "trade or commerce" within the meaning of FDUTPA. Fla. Stat. § 501.203(8).

179.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

180.     The QC Defendants and Med-Den engaged in unfair and deceptive trade practices that violated FDUTPA by executing a coordinated bait-and-switch scheme, advertising uniform financial lures—including but not limited to 0% interest financing, low monthly payments, and promising gift cards—to induce consumers to visit the clinics and purchase the non-surgical regeneration and stem cell treatments, when such financing was not actually available.

181.     The QC Defendants and Med-Den executed these unfair and deceptive trade practices through their distinct but intertwined roles:

  a.  QC Corporate created, approved, and mandated the dissemination of print, video, and radio advertisements throughout Florida promising various financial lures, including "0% Interest," "Payment Plans starting as low as $100 per month," and gift cards, to induce the Florida Financing Subclass to visit QC Kinetix clinics;

38

b. QC Kinetix Doral utilized this false and misleading advertising locally to solicit patients in South Florida and induce the Doral Financing Subclass to visit its clinic;

c. Once consumers were inside a QC Kinetix clinic, staff were trained to seamlessly pivot from the advertised promotional offers to high-interest Med-Den financing without disclosing that the advertised promotional rates were unavailable;

d. Med-Den provided the point-of-sale software and digital interfaces that allowed clinic staff to act as unlicensed brokers, seamlessly funneling patients from medical consultations into high-interest loans;

e. Med-Den designed and operated a system that allowed clinic staff to bypass traditional lending safeguards and withhold mandatory truth-in-lending disclosures from consumers;

f. Med-Den knowingly or recklessly disregarded that QC Kinetix clinic staff were trained to pivot from advertised promotional offers (such as "0% Interest") to high-interest Med-Den financing without disclosing that the advertised rates were unavailable; and

g. Med-Den processed, brokered, and funded loans carrying annual percentage rates of 9.99% or higher, and collected lucrative fees on those transactions, from vulnerable consumers who had been induced into the clinics by promises of promotional financing.

182. The QC Defendants' and Med-Den's unfair or deceptive acts or practices—including misrepresenting that their treatments could be financed at 0% interest and on favorable payment terms while utilizing a digital platform designed to conceal the true terms—had a tendency or capacity to mislead; tended to create a false impression in consumers; and were likely to deceive reasonable consumers, including Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members, about the financing options available for the treatments.

183. When deciding whether to seek out treatment from the QC Defendants and obtain financing from Med-Den, Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members had no reasonable way to know that the financing options

available for the treatments actually carried interest rates of 9.99% or higher, nor that the clinic staff controlling the digital tablets and cellular devices were enrolling them in high-interest debt. The QC Defendants misrepresented or omitted material facts about the financing options available for treatments, and the QC Defendants misled Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members.

184.    The QC Defendants and Med-Den possessed superior knowledge as to the financing terms and the mechanics of the point-of-sale portal. Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members had no reason to believe that financing for the treatments would carry interest in excess of 0% in light of the QC Defendants' advertisements promising 0% interest and favorable terms.

185.    These uniform misrepresentations, omissions, and bait-and-switch tactics were likely to deceive a consumer acting reasonably in the same circumstances, and proximately caused the ascertainable losses suffered by Plaintiff Estrada, the Florida Financing Subclass, and the Doral Financing Subclass.

186.    Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members were injured as a result of the Defendants' conduct because Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members traveled to obtain the treatments and expected to obtain treatments with financing at 0% interest and instead received and overpaid for treatments with financing carrying interest rates of 9.99% or higher.

187.    Had they been aware of these facts, Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members either would have paid less for their treatments or would not have purchased the treatments at all.

40

188.     Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members are entitled to recover their actual damages, including economic damages at the point of sale equal to the difference between the value of the treatments with financing at 0% interest as promised and the value of the treatments with financing at higher interest rates as delivered. *See* Fla. Stat. § 501.211(2). Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members are also entitled to recover their attorneys' fees. *See* Fla. Stat. § 501.2105(1).

189.     Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members are also entitled to declaratory and injunctive relief under § 501.211(1) declaring that the QC Defendants' and Med-Den's deceptive and unfair conduct violates FDUTPA and harms the consuming public, and enjoining the QC Defendants and Med-Den from further such violations.

190.     Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members were aggrieved by the QC Defendants' and Med-Den's misrepresentations and omissions because he paid a price premium for financing the treatments.

191.     Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members have also suffered and will continue to suffer irreparable harm if the QC Defendants and Med-Den continue to engage in deceptive, unfair, and unreasonable practices.

192.     Plaintiff Estrada, on behalf of the Florida Financing Subclass Members and the Doral Financing Subclass Members, requests that the Court award actual damages, declare that the QC Defendants' and Med-Den's conduct violates FDUTPA, issue an injunction requiring the QC Defendants to cease advertising promotional financing rates that are not actually available and requiring Med-Den to provide twelve months of interest-free financing on any outstanding loans

41

as promised, and award Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members' attorneys' fees and costs. Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members also request any other just and proper relief available under FDUTPA.

**COUNT III**
**Unjust Enrichment**
**(Pleaded in the Alternative)**
**(Against QC Corporate on behalf of the Florida Class and Florida Financing Subclass)**
**(Against QC Kinetix Doral on behalf of the Doral Subclass and Doral Financing Subclass)**

193. Plaintiff Estrada incorporates by reference paragraphs 1 through 156 as though set forth herein.

194. Plaintiff Estrada brings this unjust enrichment claim in the alternative to his FDUTPA claims.

195. Plaintiff Estrada brings this claim on behalf of all Florida Class Members, Doral Subclass Members, Florida Financing Subclass Members, and Doral Financing Subclass Members under the common law of unjust enrichment in the state of Florida.

196. The QC Defendants have received and retained benefits from Plaintiff Estrada, the Florida Class Members, the Doral Subclass Members, the Florida Financing Subclass Members, and the Doral Financing Subclass Members, and inequity has resulted.

197. Plaintiff Estrada, the Florida Class Members, and the Doral Subclass Members directly conferred financial benefits on the Defendants: the difference between the price paid for FDA-approved, effective regenerative treatments (as advertised) and the value of unapproved, ineffective treatments that did not work as promised (as received).

198. Additionally, Plaintiff Estrada, the Florida Financing Subclass Members, and the Doral Financing Subclass Members conferred a direct financial benefit on the QC Defendants

42

through the generation of undisclosed commissions, rebates, or kickbacks paid to the QC Defendants by Med-Den for originating the loans.

199.     Specifically, Plaintiff Estrada and the Doral Subclass Members directly conferred a financial benefit on QC Kinetix Doral by paying thousands of dollars in treatment fees at the point of sale. Furthermore, Plaintiff Estrada and the Doral Financing Subclass Members conferred a benefit by executing the Med-Den financing agreements that triggered the kickbacks. Additionally, Plaintiff Estrada and the Florida Class Members directly conferred a financial benefit on QC Corporate because a mandatory, traceable percentage of these deceptively induced treatment fees flowed directly upstream to QC Corporate in the form of franchise royalties, marketing fund contributions, and other required corporate fees.

200.     Plaintiff Estrada, the Florida Class Members, and the Doral Subclass Members paid a price premium for the non-surgical regeneration and stem cell treatments because of the QC Defendants' representations that the treatments were proven alternatives to surgery and cures for chronic pain, and because of the standardized, high-pressure sales tactics used to extract payment before those representations could be scrutinized. Plaintiff Estrada, the Florida Class members, and the Doral Subclass members would not have purchased the treatments, or would have paid significantly less, if not for these representations and uniform sales tactics.

201.     The QC Defendants benefitted through their unjust conduct by selling non-surgical regeneration and stem cell treatments at a profit and for more than the treatments were worth. The QC Defendants also benefitted from their unjust conduct by failing to disclose that the treatments were not approved by the FDA, thereby avoiding the loss of sales that such disclosure would have caused. Finally, the QC Defendants benefitted by collecting financial kickbacks from Med-Den for funneling vulnerable patients into high-interest debt.

43

202. The QC Defendants were aware that they were charging a premium for their product. The QC Defendants were aware that they were receiving a benefit they were not entitled to.

203. It would be inequitable for the QC Defendants to retain these benefits. The QC Defendants will be unjustly enriched if they are allowed to retain the benefits extracted through this deceptive marketing and sales scheme.

204. Plaintiff Estrada, the Florida Class Members, the Doral Subclass Members, the Florida Financing Subclass Members, and the Doral Financing Subclass Members do not have an adequate remedy at law.

205. Plaintiff Estrada, the Florida Class Members, the Doral Subclass Members, the Florida Financing Subclass Members, and the Doral Financing Subclass Members are entitled to recover the amount by which the QC Defendants were unjustly enriched at his or her expense.

206. Alternatively, the amount of the QC Defendants' unjust enrichment should be disgorged, in an amount to be proven at trial.

207. Plaintiff Estrada, the Florida Class Members, the Doral Subclass Members, the Florida Financing Subclass Members, and the Doral Financing Subclass Members, seeks an award against the QC Defendants in the amount by which they have been unjustly enriched at Plaintiff Estrada's, the Florida Class members', the Doral Subclass members', the Florida Financing Subclass members', and the Doral Financing Subclass members' expense, and such other relief as this Court deems just and proper.

## COUNT IV
### Unjust Enrichment
### (Pleaded in the Alternative)
### (Against Med-Den on behalf of the Florida Financing Subclass)

208.    Plaintiff Estrada incorporates by reference paragraphs 1 through 156 as though set forth herein.

209.    Plaintiff Estrada brings this unjust enrichment claim in the alternative to any claims under FDUTPA.

210.    Plaintiff Estrada brings this claim on behalf of all Florida Financing Subclass Members under the common law of unjust enrichment in the state of Florida.

211.    Med-Den has received and retained a benefit from Plaintiff Estrada and the Florida Financing Subclass Members and inequity has resulted.

212.    Plaintiff Estrada and the Florida Financing Subclass Members directly conferred financial benefits on Med-Den: specifically, the payment of high-interest charges, loan origination fees, broker fees, and other lucrative platform fees generated through Med-Den's FinTech portal.

213.    To the extent Med-Den relies upon any express financing or loan agreements to defeat this equitable claim, such agreements are void *ab initio*, voidable, or otherwise unenforceable due to unconscionability and fraud in the execution, as Plaintiff Estrada and the Florida Financing Subclass Members were systematically prevented from reviewing the terms of the agreements on the clinic-controlled digital tablets and cellular devices prior to execution.

214.    Plaintiff Estrada and the Florida Financing Subclass Members paid interest and fees on their loans because of the QC Defendants' representations—which Med-Den enabled and facilitated—that the treatments could be financed at promotional rates, such as 0% interest, and on favorable payment terms. Plaintiff Estrada and the Florida Financing Subclass Members would

45

not have obtained financing through Med-Den, or would have paid significantly less in interest, if not for these representations and uniform omissions.

215. Med-Den benefitted through its unjust conduct by collecting interest at rates of 9.99% or higher and platform fees from consumers who were induced by promises of promotional financing. Med-Den also benefitted from its role in the QC Defendants' bait-and-switch advertising scheme by receiving a steady stream of loan applications from consumers lured into the clinics by false financing promises, which Med-Den actively fueled by paying undisclosed commissions or kickbacks to the QC Defendants to incentivize the origination of these loans.

216. Med-Den was aware that the QC Defendants were advertising promotional financing that was not actually available to consumers. Med-Den was aware that it was receiving a benefit it was not entitled to by collecting interest payments and platform fees from consumers who had been promised interest-free or favorable financing.

217. It would be inequitable for Med-Den to retain these benefits. Med-Den will be unjustly enriched if it is allowed to retain the benefits obtained through the false promises of promotional financing and the deceptive, high-pressure execution of the loans, which Med-Den actively encouraged through its undisclosed kickback arrangement.

218. Plaintiff Estrada and the Florida Financing Subclass Members do not have an adequate remedy at law.

219. Each Florida Financing Subclass Member is entitled to recover the amount by which Med-Den was unjustly enriched at his or her expense.

220. Alternatively, the amount of Med-Den's unjust enrichment should be disgorged, in an amount to be proven at trial.

221.     Plaintiff Estrada, on behalf of himself and all similarly situated Florida Financing Subclass Members, seeks an award against Med-Den in the amount by which it has been unjustly enriched at Plaintiff Estrada's and the Florida Financing Subclass Members' expense, and such other relief as this Court deems just and proper.

**COUNT V**
**Violation of Florida's Adult Protective Services Act (the "Elder Abuse Act"),**
**Fla. Stat. § 415.1111, et seq.**
**(Individually against QC Kinetix Doral)**

222.     Plaintiff Estrada incorporates by reference paragraphs 1 through 156 as though set forth herein.

223.     Plaintiff Estrada is a "vulnerable adult" within the meaning of the Elder Abuse Act. Fla. Stat. § 415.102(28). Specifically, Plaintiff Estrada is 87 years old and his ability to perform the normal activities of daily living and to provide for his own care or protection is impaired due to the infirmities of aging. Among other things, Plaintiff Estrada suffers from cognitive and physical decline consistent with that of an aging individual, including chronic joint pain that limits his mobility and his ability to care for himself. Plaintiff Estrada is less confident in his decision-making abilities than he was at a younger age and would not have fallen victim to this scheme at a younger age.

224.     The Elder Abuse Act provides that "a vulnerable adult who has been abused, neglected, or exploited as specified in this chapter has a cause of action against any perpetrator and may recover actual and punitive damages for such abuse, neglect, or exploitation." Fla. Stat. § 415.1111.

225.     QC Kinetix Doral stood in a "position of trust and confidence" with respect to Plaintiff Estrada within the meaning of Florida Statute § 415.102(19). Specifically, QC Kinetix Doral was "entrusted with" and "assumed responsibility for the use or management of" Plaintiff

47

Estrada's funds, assets, and property when clinic staff took control of his iPhone, created a Gmail account in his name, processed a loan application without disclosing that it was a loan, and obtained a $9,000 loan and, upon information and belief, a line of credit on his behalf. *See* Fla. Stat. § 415.102(19)(d).

226.    QC Kinetix Doral knew or should have known that Plaintiff Estrada lacked the "capacity to consent" within the meaning of Florida Statute § 415.102(4). Plaintiff Estrada did not have sufficient understanding to make responsible decisions regarding his property because: (a) he did not have an email address and did not understand how to create or manage one; (b) he was not digitally literate and could not navigate the electronic loan application on his iPhone; (c) clinic staff had to create an email account for him to complete the transaction; (d) he only speaks Spanish, but all documents—including the loan application and financing paperwork—were in English and were never translated or explained to him; and (e) clinic staff navigated directly to the signature blocks rather than allowing him to review the loan terms, and never disclosed that he was signing a loan agreement.

227.    QC Kinetix Doral "exploited" Plaintiff Estrada within the meaning of Florida Statute. § 415.102(8). Standing in a position of trust and confidence, QC Kinetix Doral knowingly, by deception and intimidation, obtained and used Plaintiff Estrada's funds, assets, and property with the intent to temporarily or permanently deprive Plaintiff Estrada of the use, benefit, or possession of those funds for the benefit of QC Kinetix Doral and QC Corporate. The deception and intimidating pressure tactics included, but were not limited to, the following:

    a.  Creating a Gmail account in Plaintiff Estrada's name without his meaningful consent, thereby ensuring that all truth-in-lending disclosures, payment

48

notifications, and other communications regarding his debt would be sent to an account he did not know how to access;

b.   Failing to disclose that the non-surgical regeneration and stem cell treatments were not approved by the FDA, thereby deceiving Plaintiff Estrada into believing he was purchasing a legitimate, proven medical treatment;

c.   Failing to have a licensed medical professional evaluate Plaintiff Estrada before prescribing the Treatment Plan, instead using a "Patient Care Coordinator" trained to close the sale;

d.   Refusing to permit Plaintiff Estrada to review the financing documents or Treatment Plan before signing, instead navigating directly to the signature blocks on his iPhone and instructing him to sign without disclosing that the documents constituted a loan agreement;

e.   Obtaining a $9,000 loan in Plaintiff Estrada's name when his annual income was only $15,000, saddling him with debt equal to 60% of his entire annual income and monthly payments of $166.69 that consume a significant portion of his fixed monthly income of $1,250;

f.   Opening, upon information and belief, a revolving line of credit in Plaintiff Estrada's name using the email credentials that clinic staff controlled and without his knowledge or meaningful consent; and

g.   Charging Plaintiff Estrada an annual percentage rate of 9.99% on the loan despite having advertised 0% interest financing, thereby extracting additional funds through interest payments.

49

228.     QC Kinetix Doral's exploitation of Plaintiff Estrada constitutes an "[i]ntentional or negligent failure to effectively use [his] income and assets for the necessities required for [his] support and maintenance" within the meaning of Florida Statute § 415.102(8)(b)(4). Rather than using Plaintiff Estrada's limited income for his necessities, QC Kinetix Doral extracted those funds to pay for unapproved, ineffective treatments that provided no medical benefit.

229.     QC Kinetix Doral acted with the intent to temporarily or permanently deprive Plaintiff Estrada of the use, benefit, or possession of his funds, assets, and property for the benefit of someone other than Plaintiff Estrada—namely, QC Kinetix Doral and QC Corporate. This intent is evidenced by the clinic's systematic process of fusing the medical consultation with the financing transaction, controlling the patient's email and digital access, rushing the patient through signature without review, and extracting maximum debt from a patient on a fixed poverty-level income.

230.     As a direct and proximate result of QC Kinetix Doral's exploitation, Plaintiff Estrada accepted treatment and obtained financing through Med-Den that he would not have accepted or obtained but for the deception and intimidating pressure tactics.

231.     Plaintiff Estrada was injured as a result of QC Kinetix Doral's exploitation. He has been deprived of the use, benefit, and possession of his funds through: (a) the $9,000 loan principal; (b) interest charges of 9.99%; (c) monthly payments of $166.69 that strain his fixed income of $1,250 per month; and (d) liability under a line of credit opened without his knowledge or meaningful consent.

232.     Plaintiff Estrada suffered ascertainable losses as a result of QC Kinetix Doral's exploitation, including the loan principal, interest paid, and any amounts drawn on the

50

unauthorized line of credit, as well as the emotional distress of having his financial security and retirement undermined by a predatory scheme.

233. As a direct and proximate result of QC Kinetix Doral's violations of the Elder Abuse Act, Plaintiff Estrada suffered an injury-in-fact and actual damages.

234. Plaintiff Estrada is entitled to recover his actual damages, including all amounts paid or owed under the loan and line of credit, as well as punitive damages for QC Kinetix Doral's willful exploitation of a vulnerable adult. *See* Fla. Stat. § 415.1111. Plaintiff Estrada is also entitled to recover his attorneys' fees. *See id.*

235. Plaintiff Estrada requests that the Court award actual damages, punitive damages, and attorneys' fees and costs against QC Kinetix Doral. Plaintiff Estrada also requests any other just and proper relief available under the Elder Abuse Act.

## PRAYER FOR RELIEF

Plaintiff Estrada, on behalf of himself and all other similarly situated Florida Class Members, requests that the Court enter judgment against the Defendants as follows:

(1) Declare this action to be a proper class action maintainable under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and designate and appoint Plaintiff Estrada as the representative for the Florida Class, the Florida Financing Subclass, the Doral Subclass, and the Doral Financing Subclass and appoint Plaintiff's chosen counsel as Class Counsel;

(2) Declare that the QC Defendants' advertising of the non-surgical regeneration and stem cell treatments violated Florida Statute § 458.3245(5)(a)-(b) and constitutes a per se violation of FDUTPA;

(3) Declare that the QC Defendants' and Med-Den's advertising and execution of promotional financing that was not actually available violates FDUTPA;

51

(4)     Declare that the Defendants' sales and marketing conduct is unlawful, unfair, or deceptive and issue an order permanently enjoining the Defendants from continuing the unlawful, deceptive, and unfair business practices alleged in this action, including requiring the QC Defendants to include the statutory notice required by § 458.3245(5)(a)-(b) in all future advertisements, and requiring Med-Den to cease its deceptive platform practices;

(5)     Order the disgorgement and restitution of all monies by which the QC Defendants and Med-Den were unjustly enriched at the expense of Plaintiff Estrada and the Class and Subclass Members;

(6)     Award Plaintiff Estrada, individually, actual, and punitive damages against QC Kinetix Doral for willful exploitation under the Elder Abuse Act (Fla. Stat. § 415.1111), and order the rescission, cancellation, and voiding of the fraudulently obtained Med-Den loan and line of credit;

(7)     Award Plaintiff Estrada, the Florida Class Members, and Subclass Members actual, compensatory, and punitive damages, including interest, in an amount to be proven at trial under the applicable claims;

(8)     Award Plaintiff Estrada, the Florida Class Members, and Subclass Members their reasonable attorneys' fees and costs, as allowed by law;

(9)     Award Plaintiff Estrada, the Florida Class Members, and Subclass Members pre-judgment and post-judgment interest as provided by law; and

(10)     Award Plaintiff Estrada, the Florida Class Members, and Subclass Members any further and different relief as this case may require or as determined by this Court to be just, equitable, and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiff demands a jury trial for any

and all issues triable by a jury.

Respectfully submitted: March 23, 2026

By: /s/ Benjamin Widlanski, Esq.
**Benjamin J. Widlanski, Esq.**
Florida Bar No. 1010644
bwidlanski@kttlaw.com
**Rasheed K. Nader, Esq.**
Florida Bar No. 1002362
rnader@kttlaw.com
**Ofir Besharim, Esq.**
Florida Bar No. 1048120
obesharim@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508

*Counsel for Plaintiff*